IN UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CHARLES L. DAVIS and JAMES R. WEEDE, *individually and on behalf of all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>RETIREMENT PLAN OF PHIBRO ANIMAL HEALTH CORPORATION AND SUBSIDIARIES AND AFFILIATES, PHIBRO ANIMAL HEALTH CORPORATION, PRINCE AGRI PRODUCTS, INC., PRINCE MINERALS, INC., JACK C. BENDHEIM, RICHARD G. JOHNSON, *and* DAVID C. STORBECK,<br><br>Defendants. | Case No. 3:08-cv-00779 |

## MEMORANDUM & ORDER

This matter comes before the Court on the parties' cross-motions for summary judgment. The plaintiffs in this matter, Davis and Weede (hereinafter "Davis" unless otherwise stated) filed a motion for summary judgment (Doc. 136) and memorandum in support (Doc. 137), to which the defendants, Retirement Plan of Phibro Animal Health Corporation and subsidiaries and affiliates, Phibro Animal Health Corporation, Prince Agri Products, Inc., Prince Minerals Inc., Jack Bendheim, Richard Johnson, and David Storbeck, (hereinafter "Phibro"), filed a response (Doc. 149), and Davis filed a reply (Doc. 153). Phibro then filed its own motion for summary judgment (Doc. 138) and memorandum in support (Doc. 139), to which Davis filed a response (Doc. 148) and Phibro filed a reply (Doc. 154). Phibro also filed a response to Davis's statement of undisputed material facts (Doc. 150).

I. **Background**

A. Factual

The retirement plan in question was originally established effective January 1, 1951 and is a defined benefit plan. Davis was hired by Prince Manufacturing on September 14, 1971. Phillip Brothers acquired Prince Manufacturing on November 1, 1974 and Davis claims he became a participant in the plan at this point. The Plan back-credited Davis's benefit-related service to September 14, 1971 for purposes of calculating his benefits. Plaintiff Weede commenced employment on March 4, 1985 and participated in the retirement plan.

In 1980, Phillip Brothers created Prince Agri as a wholly owned subsidiary. In 1988, Phibro retained James Benefits to review the plan's terms. The report written by James Benefits ("James Report") suggested Phibro (then Phillips Company) "freeze the existing accrued benefits, and adopt a new benefits formula providing the basic level of benefits for further service…" (Doc.150, para. 12). Around May 30, 1989, Phibro distributed a letter signed by Jack Bendheim to Davis and Weede along with a brochure entitled "Retirement and Savings Plan." On August 15, 1989, Phibro adopted Amendment No. 3 which amended Section 3.01 of the plan retroactively to July 1, 1989. The relevant portion of the amendment states:

> Notwithstanding the foregoing, if a Participant's Normal Retirement Pension determined as of June 30, 1989 based on Average Compensation determined as of June 30, 1989, exceeds the amount determined in accordance with the first sentence of this Section 3.01(a), then the Participant's Normal Retirement Pension shall be his Normal Retirement Pension determined as of June 30, 1990, based on Average Compensation determined as June 30, 1989.

(Doc. 137-11). Phibro did not distribute a notice characterized as a § 204(h) notice after it adopted Amendment No. 3 on August 15, 1989. Phibro asserts this is because none was required following the distribution of the May 1989 letter and brochure.

2

Following the July 1st Amendment, Phibro adopted an Amendatory Amendment No. 3 on September 12, 1990. This amendment applied retroactively to July 1, 1989 because the original amendment did not accurately reflect the intent of the company. The Amendatory Amendment stated the plan was to provide:

i.    The Participant's Accrued Benefit, if any, as of June 30, 1989; plus

ii.   One percent (1%) of the Participant's Average Compensation multiplied by his Years of Service after July 1, 1989; plus one-half percent (1/2%) of the Participant's Average Compensation over the Social Security Taxable Wage Base, multiplied by his Years of Service after July 1, 1989.

 In 1991, Phillip Brothers was preparing to spin-off two divisions then known as C.P. Chemicals and C.P. Organics into a public company.  In anticipation of the spin-off, Phibro purchased an annuity for Davis in the amount of $5,611.56 payable as a ten-year certain and continuous annuity, with monthly pay-outs of $467.63 to begin on October 1, 2013.

On September 1, 2003, Phillip Brothers changed its name to Phibro Animal Health Corporation.  In late 2003, Phibro sold Prince Manufacturing to Palladium Equity Partners, who changed the name of the company to Prince Minerals, Inc.  Davis and Weede remained employed by Phibro/Prince Agri and remained participants in the plan after the sale of Prince Manufacturing. The Plan was renamed to its current name effective April 15, 2005.  Davis left his employment with Phibro on June 30, 2006 and received a copy of his final benefit statement and benefit calculation worksheet on November 8, 2006.  Weede left his employment on April 9, 2009 and the record is unclear as to whether he received his final statement on April 21, 2009 or April 29, 2009.

According to the terms of the current Plan, effective July 1, 1997, Davis's normal retirement pension is the sum of:

(a).  His Accrued Benefit under the Prior Plan, determined as of June 30, 1989, under the terms and conditions of the Prior Plan, plus

(b).  His normal retirement pension earned after July 1, 1989 determined based on his age, his average compensation, and his years of service.

The dispute turns on how the accrued benefit in Part (a) was calculated.  Davis believes that under the terms of the Prior Plan, his accrued benefit as of June 30, 1989, could not have been calculated until he retired or otherwise left employment with Phibro.  Because, until then, the Plan could not calculate his "Average Compensation" which is defined as "your compensation averaged over the five consecutive years during which your pay is highest within the ten-year period before your normal retirement date or the date of your earlier termination of employment."  Under the terms of the Prior Plan, Davis's "normal retirement benefit" was calculated as 3% of the employee's Average Compensation reduced by 66 2/3% of the employee's Social Security Benefits.

When Davis did the math, plugging in his "Average Compensation," he came up with a number that is radically different from the number the Plan came up with.  He contacted Dianne Kappes, a benefits coordinator at Phibro asking how the Plan arrived at its figure.  He was told the 6/30/1989 accrued benefit is based upon average compensation as of 6/30/1989. The 6/30/1989 accrued benefit was calculated for all participants around that time and Phibro does not have copies of the original calculations and those amounts are frozen benefit amounts based on pay prior to 6/30/1989. He was further told the accrued benefit did not increase as a result of pay increases after 6/30/1989.  Rather, the benefit earned for service after 6/30/1989 was added

to the 6/30/1989 accrued benefit to come up with the total benefit. The 6/30/1989 accrued benefit was not adjusted for any pay increases occurring after 6/30/1989. This was consistent with the annual statements received over the years by Davis and Weede.

B. Procedural

This matter was originally filed November 5, 2008. Phibro filed a motion to Dismiss (Doc. 15) which was denied in part and granted in part (Doc. 44). The Court stayed the matter for ninety days to allow the parties to take part in the administrative process and ordered them to file a joint status report. The stay was lifted on September 25, 2009 and Davis filed an Amended Complaint (Doc.55) on October 16, 2009. Davis then filed an Amended Motion to Certify Class (Doc. 72) which has been stayed pending the resolution of the pending motions for summary judgment (Doc. 152). On November 12, 2010, the Court granted the parties' jointly requested sixty day stay (Doc. 109). Following the lift of the stay, Davis filed a Second Amended Complaint (Doc. 114) on January 31, 2010 which added Plaintiff Weede. Phibro answered and pleaded a counterclaim against Plaintiff Weede for breach of contract (Doc. 122). Davis then filed a motion to strike the answer which contained the counterclaim (Doc. 147) to which Phibro responded (Doc. 151). Davis's subsequently filed a consent motion to strike counts II, IV, V, and VI of the second amended complaint with prejudice as to Davis and without prejudice as to Weede which the Court granted (Doc. 124).

The counts which remain against Phibro (*et al.*) by Davis and Weede ("Davis") therefore include Counts I and III. In Count I, Davis seeks recovery of benefits or clarification of the right to future benefits under the terms of the Plan using the final Average Compensation to calculate the Accrued Benefit as of June 30, 1989 under 29 U.S.C. §1132(a)(1)(B). In Count III Davis seeks injunctive relief pursuant to 29 U.S.C. §1132(a)(3) to render Amendment 3 as void

5

*ab initio* because of failure to provide notice in violation of 29 U.S.C. §1054(h). Phibro asserted a counterclaim against Weede for breach of contract based upon the bringing of this suit. Phibro alleges the claim release Weede signed has been violated by this suit and Weede therefore needs to return the $96,562.44 he has received upon retirement back to Phibro. This brings the Court to the present pending cross-motions for summary judgment (Docs. 136, 138) in which the parties both seek judgment in their favor on counts I and III. Davis's motion, though filed first, focused on why he should prevail on the substantive claims whereas Phibro's motion argued why it should prevail procedurally. The Court therefore begins its analysis with the motion to strike (Doc. 147) and Phibro's procedural arguments (Doc. 138).

II. **Phibro's Counterclaim**

In Phibro's answer to Davis's Second Amended Complaint, it added a counterclaim against Weede (second named plaintiff) alleging a breach of contract for violating the Separation & Release Agreement. Weede then moved to strike the counterclaim on the basis it was retaliatory against Weede for exercising his rights under ERISA (Doc. 147). The Court is aware the motion to strike was filed very late and without permission of the Court to file such a late response. In spite of this, the Court considers its merits. The defendants had the opportunity to respond to the motion and did in fact do so (Doc. 151) and the Court finds it is sufficiently briefed on the motion to render a decision. Plaintiff Weede also responded to the counterclaim within its motion to strike.

A. Standard

There are two ways to establish a prima facie case for unlawful retaliation: the direct method and the indirect method. *Stone v. City of Indianapolis Public Util. Div.,* 281 F.3d 640, 644 (7th Cir. 2002). In order to survive a motion for summary judgment under the direct method,

Weede must present direct evidence that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two. *Haywood v. Lucent Tech., Inc.,* 323 F.3d 524, 531 (7th Cir. 2003). With the indirect method, Weede must establish: (1) he engaged in statutorily protected activity; (2) he performed his job to legitimate expectations; (3) despite his satisfactory performance, he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *See Luckie v. Ameritech Corp.*, 389 F.3d 708 (7th Cir. 2004); *Stone,* 281 F.3d at 644.

In order to make a prima facie case specifically under § 510, Weede must show "that he (1) belongs to the protected class; (2) was qualified for his job position; and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent to retaliate" or to prevent the use of benefits was present. *Grottkau v. Sky Climber, Inc.,* 79 F.3d 70, 73 (7th Cir.1996). In a § 510 case, however, the Court does not need to determine if the plaintiff established a prima facie case if the defendant was able to advance a legitimate, nondiscriminatory reason for its action. *Isbell v. Allstate Ins. Co*., 418 F.3d 788, 798 (7th Cir. 2005)

B.     Analysis

Weede bases his motion to strike the counterclaim or amend his second amended complaint on the allegation the counterclaim is retaliatory. Weede argues the benefits he is seeking to recover accrued after the agreement was signed and the parties argue over when Weede knew about the pending lawsuit. These arguments, however, are not relevant to whether Phibro's counterclaim was retaliatory as the Court does not find the counterclaim to be retaliatory in the most basic sense. In order for an action to be retaliatory there must be an adverse employment

action. *Isbell,* 418 F.3d at 796. This simply was not present here; Phibro's counterclaim did not negatively impact the circumstances of employment. First of all, Weede had already ended his relationship with the company prior to the counterclaim. Phibro seeks to enforce a separate agreement which was executed prior to Weede's joining the lawsuit and therefore its enforcement cannot be seen as retaliatory against his employment. Weede had counsel review the agreement with him and could have negotiated to change its contents but did not. There is simply no evidence or cases to support the proposition that the enforcement of an agreement which was executed prior to the litigant joining a lawsuit and upon the voluntary termination of employment is retaliatory. The Court therefore denies the motion to strike (Doc. 147).

Having found the counterclaim not to be retaliatory, the Court turns now to its merits. In Phibro's pleadings, it describes the agreement as a "general release." (Doc. 151). In Weede's pleadings, the agreement is titled "Separation Agreement and Release." (Doc. 147). Phibro then appears to try to turn the release into a covenant not to sue in its pleadings for summary judgment. The Seventh Circuit has held a "release" and a "covenant not to sue" to be distinctly different devices with different legal remedies. *Isbell*, 418 F.3d at 796; *Thomforde v. Int'l Bus. Machs. Corp.,* 406 F.3d 500, 503 (8th Cir.2005). A release is effectively an affirmative defense rather than a covenant not to sue which would provide for damages. *Id.*

After reading the Separation Agreement (Doc. 139-3), which specifically states "you completely release and forever discharge PAHC from all claims…" the Court finds it to be a release, and not a covenant not to sue. The word "covenant" cannot be found in the document; rather it is continually referred to as a "release." Although the release states Weede agrees not to sue for past claims, it later states "you do not waive rights or claims that may arise after the date of your execution of this Agreement…" Like in *Isbell* the language of the agreement releases the

defendant from liability for past claims but the release "does not contain plain language that amounts to an agreement not to sue." 418 F.3d at 797. As such, the release is an affirmative defense to Weede's claims and not a separate cause of action for Phibro against Weede. The Court therefore denies Phibro's motion for judgment as to its counterclaim and dismisses it with prejudice. The significance of the release will properly be considered upon the Court's review of the parties' claims below.

III.    **Separation & Release Agreement**

Davis and Weede both signed general release forms with Phibro. Davis signed his release on January 16, 2002 and terminated his employment on June 30, 2006. Weede terminated his employment on April 8, 2009 and signed the release on April 21, 2009. It is Phibro's position that these releases which waive claims "up to and including the date of the execution of this Agreement" bar the plaintiffs' claims now. Davis and Weede ("Davis") argue, however, that the claims did not accrue until after the administrative claim was denied on September 18, 2009[1] and therefore are not barred by the release. Davis further alleges pension plan participants can never waive their pension benefit except in a contested claim.

A.  Standard

"The validity of a waiver of pension benefits under ERISA is subject to closer scrutiny than a waiver of general contract claims." *Boeckman v. A.G. Edwards Inc.,* 461 F. Supp.2d 801, 809 (S.D. Ill. 2006) *(*citing *Sharkey v. Ultramar Energy Ltd., Lasmo plc, Lasmo (AUL Ltd.),* 70 F.3d 226, 231 (2d Cir.1995)). For a release to be valid, the party must sign it knowingly and voluntarily. *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 52 n. 15 (1974) (applying this principle to waivers of Title VII rights). A court must examine the totality of the circumstances

---

[1] The Court notes the administrative review occurred when this Court ordered Davis to exhaust his administrative remedies after the lawsuit had already commenced.

surrounding the signature, including such matters as: (1) the employee's education and business experience; (2) the employee's input in negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the amount of time the employee had for deliberation before signing the release; (5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted with an attorney; (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and (8) whether the employee's release was induced by improper conduct on the defendant's part. *Howell v. Motorola,* 633 F.3d 552 (7th Cir. 2011) (citing *Pierce v. Atchison, Topeka and Santa Fe Ry. Co.,* 65 F.3d 562, 571 (7th Cir.1995)).

If the release is valid, the Court will next examine whether the plaintiffs' claims can be waived with a release. ERISA states that "[e]ach pension plan shall provide that benefits provided under the plan may not be alienated or assigned." Title 29 U.S.C. § 1056(d)(1). This "anti-alienation provision," however, "does not impose a bar on settlement agreements wherein pension claims are knowingly and intentionally resolved by employees. *Lynn v. CSX Transp., Inc.*, 84 F.3d 970, 975 (7th Cir. 1996). The anti-alienation provision does not "establish the untenable rule that ERISA prevents plaintiffs from ever entering into a settlement in a dispute over lost pension benefits." *Id.* (citing *Lumpkin v. Envirodyne Industries, Inc.,* 933 F.2d 449, 455 (7th Cir.1991)).

Pension entitlements are, without exception, subject to the anti-alienation provision of ERISA. *Patterson v. Shumate,* 504 U.S. 753, 760 (1992). A pension entitlement arises under the terms of the pension plan itself. A release may prevent a plan participant from asserting claims based on a settlement agreement, but may not bar claims based on pension entitlements. *Lynn*, 84

F.3d at 975. "A contested pension claim, by contrast, arises under a settlement agreement. A release may prevent a plan participant from asserting claims based on a settlement agreement, but may not bar claims based on pension entitlements." *Id.* at 975. In *Lynn,* the plaintiff sought "to protect military service benefits to which he believe[d] he [was] entitled to under the terms of the plan." *Lynn,* 84 F.3d at 977. The court found that the plaintiff was "asking the court to interpret the pension plan itself" and thus the plaintiff's claim involved a pension entitlement subject to the anti-alienation provision.

Contested pension claims, however, are "simply outside the realm of the [anti-alienation] provision." *Id; Lumpkin,* 933 F.2d at 456. The Seventh Circuit has held "[i]t is well established a general release is valid as to all claims of which a signing party has actual knowledge or that he could have discovered upon reasonable inquiry." *Fair v. International Flavors and Fragrances*, 905 F.2d 1114, 1116 (7th Cir. 1990); *see also Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.,* 568 F.Supp. 1096, 1101 (N.D.Ill.1983); *Oglesby v. Coca–Cola Bottling Co.,* 620 F.Supp. 1336, 1342 (N.D.Ill.1985). Originally, the Seventh Circuit and its district courts primarily found releases barring ERISA claims which arose under settlement agreements rather than general releases. *See e.g., Fair v. International Flavors & Fragrances, Inc.,* 905 F.2d 1114 (7th Cir.1990), and *Licciardi v. Kropp Forge Emp. Retirement Plan,* 990 F.2d 979 (7th Cir.1993). In both *Fair* and *Licciardi,* the plaintiffs had entered into settlement agreements about the pension plans prior to their filing lawsuits. In *Fair,* the Seventh Circuit refused to examine the substance of ERISA claim after finding the suit was barred by the settlement agreement the plaintiff signed. The Court examined that Fair may have had actual knowledge of the defendant's refusal to categorize the $85,000 she was paid in a settlement as wages (for pension purposes), "and, in any event, certainly had sufficient constructive knowledge to support the release and

covenant not to sue." 905 F.2d at 1116. The settlement agreement, therefore, formed the basis for the claim being "contested." *Id.*

More recently, "contested claim" has been interpreted more broadly than arising under a settlement agreement. *See Howell v. Motorola*, 2005 WL 2420410 (N.D. Ill. 2005) *aff'd* 633 F.3d 552, 567 (7th Cir. 2011); *Hakim v. Accenture United States Pension Plan*, 2011 WL 4553022 (N.D. Ill. Sept. 29, 2011). In *Howell*, the Seventh Circuit held "[a]ll that the release he signed accomplished was to settle, in advance, any claims that he might have brought against Motorola arising out of his employment there or his participation in the Plan…" 633 F.3d at 561. This interpretation appears to expand upon the original requirement of an actual settlement agreement. The *Howell* Court also stated a release is not inconsistent with the anti-alienation provisions of ERISA. *Id.* at 561. "A release, however, does not relieve a fiduciary of any responsibility, obligation, or duty imposed by ERISA; instead, it merely settles a dispute that the fiduciary did not fulfill its responsibility or duty on a given occasion." *Id.* (citing *Leavitt v. Northwestern Bell Telephone Co.,* 921 F.2d 160 (8th Cir.1990)) (discussing a 502 (a)(2) claim). The *Howell* and *Lynn* holdings were further expounded upon by *Hakim* in which the District Court for the Northern District of Illinois stated:

> In other words, under *Howell,* and consistent with *Lynn,* a release cannot bar a plaintiff's recovery of his pension as it stood when he signed a release, but it can bar claims that a plaintiff is entitled to additional benefits based on purported ERISA violations, provided that the plaintiff had actual or constructive notice of the claims at the time that he executed the release.

2011 WL 4553022, *3 (2011). In *Hakim*, the plaintiff was suing for a violation of §204(h) for the failure to provide proper notice. The court held that such a claim was not a pension entitlement following the *Howell* decision. *Id.* It therefore went on to consider whether the claim was contested at the time the release was signed.

A contested claim is one that "the claimant had actual or constructive knowledge of ... at the time of the signing of the release," such "that it could have been contested and resolved at the time the release was entered into (but was not)." *Lynn*, 84 F.3d at 975. In determining whether a claim may be considered contested, the Court inquires into "whether the claimant knew of the claim and knowingly relinquished it (relinquishment of course including failure to act or to raise the issue at all)." *Howell v. Motorola*, 2005 WL 2420410 (N.D. Ill. 2005) *(*citing *Lynn*, 84 F.3d at 976). With respect to "whether a retiree knowingly relinquished a claim, the court must look to all of the circumstances to determine what the claimant knew or reasonably should have known." *Id.* With regards to a 204(h) claim, *Hakim* held the plaintiff to be on constructive notice when he "*knew or should have known* that the amendment has brought about a clear repudiation of certain rights that [plaintiffs] believe [they] had under the plan" and, "correspondingly, that they had not received the required notice." 2011 WL 4553022, *3 (emphasis in the original) (citing *Romero v. Allstate Corp.,* 404 F.3d 212, 223–226 (3rd Cir.2005)).

Courts within the Seventh Circuit have also held a release can bar claims for vested benefits unless there is a "carve out provision" protecting vested benefits from the release. In *Brieger v. Tellabs Inc.*, the plaintiffs signed release agreements which specifically stated they were not releasing claims as to any vested benefits under the Tellabs Advantage Program. 473 F.Supp.2d 878, 886 (N.D.Ill., 2007). Similarly, in *Nelson v. Ipalco Enter., Inc.,* which was relied upon by the *Brieger* court, the release agreement stated it "shall not effect employees' benefits under the Thrift Plan." 2005 WL 1924332, *885-86 (S.D. Ind. Aug. 11, 2005). The *Brieger* court further stated "[d]efendants rely on *Howell v. Motorola, Inc.,* for their argument that the releases bar plaintiffs' claims for breach of fiduciary duty. *See Howell v. Motorola, Inc.,* 2005 WL 2420410 (N.D. Ill. Sept. 30, 2005). The release in *Howell,* however, did not include a carve-out

of claims for vested benefits." 473 F. Supp. 2d at 886 FN3. Similarly, in *Boeckmann v. A.G. Edwards Inc.*, the court found the release did not bar the claim for benefits because the release did not apply to "vested benefits." 461 F. Supp. 2d 801, 809-10 (S.D. Ill. 2006). The court relied upon two other circuits when it stated **"**[c]learly, a plaintiff alleging that his benefits were wrongly computed has a claim for vested benefits." *Id.* at 810; *Yancy v. American Petrofina, Inc.,* 768 F.2d 707, 708-09 (5th Cir.1985); *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan,* 883 F.2d 345 (5th Cir.1989).

B.  Analysis

The first question pertains to whether the release was valid. The Court examines the factors provided in *Howell.* The first factor is the plaintiffs' education and business experience. Davis has a MBA he obtained in 2005 and a bachelor's degree he obtained in 1970. He was in charge of operations for all of Phibro (and its predecessors) plants. Weede was a Vice President and General Manager at Phibro (and its predecessors) and his education level is not mentioned in his deposition. Both Davis and Weede were given substantial time to review the agreement and to consult an attorney about the release. Weede specifically contacted his personal attorney and had him review the release before signing it. The agreements are not ambiguous or confusing as to the rights of the parties. There is no evidence either Davis or Weede did not read the release before signing it or that the release was induced by improper conduct by the defendants. There is also no evidence as to whether the consideration given (retirement benefits) exceeded the benefits which they were already entitled. There is language in the agreement that the money is being given as "consideration," however, there is no other evidence regarding what would have been given had the plaintiffs refused to sign the agreements. After reviewing the factors, the Court sees no reason why the releases would be invalid. *See Howell v. Motorola,* 633 F.3d 552

(7th Cir. 2011) (citing *Pierce v. Atchison, Topeka and Santa Fe Ry. Co.,* 65 F.3d 562, 571 (7th Cir.1995)).

There are two remaining claims pending against Phibro, Count I to recover or clarify benefits pursuant to § 502(a)(1)(B) and Count III for failing to provide proper notice under § 204(h). The Court now addresses the effect of the release on each count separately.

1) §502(a)(1)(B)

In Count I, Davis and Weede allege their benefits were wrongly computed. This is based upon the disagreement over the "frozen" benefits in 1989. Davis and Weede argue the benefits were wrongly computed because the "Average Compensation" was wrongly computed. Like *Boeckmann,* Davis's release explicitly exempts vested benefits (Doc. 148-5, p. 5). 461 F. Supp. 2d 801, 809-10 (S.D. Ill. 2006). A claim for wrongly computed benefits is clearly a vested benefit. *Id*; *Sommers Drug Stores Co. Employee Profit Sharing Trust v. Corrigan,* 883 F.2d 345 (5th Cir.1989). As Davis's release agreement carved out an exception for vested benefits and his claim is for a vested benefit, the Court finds that Count I is not barred or waived by the release form signed by Davis.

Weede's release does not explicitly exempt vested benefits, however, the Court finds the claim in Count I to be a pension entitlement which cannot be waived. Under *Lynn*, this claim disputes a pension entitlement because it is asking the Court to interpret the meaning of the plan itself (namely the definition of "Average Compensation). *Lynn,* 84 F.3d at 977. The lack of a carve out provision in Weede's release does not prevent his claim because it is a pension entitlement and may not be alienated or assigned. Title 29 U.S.C. § 1056(d)(1). The Court therefore finds Count I is not barred or waived by the release form signed by Weede.

2)  § 204(h)

The remaining claim, Count III, is for a violation of 204(h), similar to *Howell* and *Hakim*. This claim is not a pension entitlement because it is not asking the Court to interpret the plan itself but rather is claiming a wrong-doing in reference to the plan. As the court in *Hakim* stated, a release "can bar claims that a plaintiff is entitled to additional benefits based on purported ERISA violations, provided that the plaintiff had actual or constructive notice of the claims at the time that he executed the release." 2011 WL 4553022, *3 (2011). The plaintiff in *Hakim*, like the plaintiffs here, was suing for a violation of 204(h) for failure to receive notice of a change. *Id.* The *Hakim* court then turned to whether the plaintiff had actual or constructive notice of the claim when the release was executed.

Davis and Weede argue their claims did not begin to accrue until the administrative review was denied, similar to the plaintiff in *Hakim.* The *Hakim* court, however, rejected this argument and looked instead to when the plaintiff knew or should have known there was a repudiation of rights and had not received the required notice. 2011 WL 4553022, *3 (citing *Romero v. Allstate Corp.,* 404 F.3d 212, 223–226 (3rd Cir.2005)); *see also, e.g., Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 66 (7th Cir. 1996); *Hakim v. Accenture United States Pension Plan*, 656 F.Supp.2d 801, 817 (N.D. Ill. 2009); *Miles v. New York State Teamsters Conference Pension & Retirement Fund Employee Pension Benefit Plan,* 698 F.2d 593, 598 (1983 2d Cir.). Here, the 204(h) claim accrued, at the absolute latest, on September 12, 1990 when Phibro adopted Amendatory Amendment No. 3 which amended sections of the Plan retroactively effective July 1, 1990. Davis and Weede were both aware changes had been made to the plan which affected their rights under the plan and should have known they did not receive

notice to those changes, if indeed they did not receive notice.[2] The Court therefore finds that both Davis and Weede had constructive notice of their 204(h) claim and therefore the 204(h) claim is barred by the releases signed after the date they were aware.[3] *See Howell v. Motorola*, 2005 WL 2420410 (N.D. Ill. 2005) *aff'd* 633 F.3d 552, 567 (7th Cir. 2011); *Hakim v. Accenture United States Pension Plan*, 2011 WL 4553022 (N.D. Ill. Sept. 29, 2011) (this case is a subsequent case from the 2009 *Hakim* case which is also cited).

The Court grants in part and denies in part Phibro's motion for summary judgment on the basis of the release. The Court denies summary judgment as to Count I finding that the plaintiffs stated a claim for pension entitlement which cannot be waived. The Court grants summary judgment as to Count III finding the claim was released by the agreements signed by the plaintiffs.

IV.    **Statute of Limitations**

Phibro argues in its motion that the statute of limitations began to run when the plaintiffs received notice of the amendments. Davis however believes the statute of limitations did not begin to run until the administrative review was denied. The Court now considers these arguments as to the remaining Count I.

A.  Standard

ERISA does not provide a limitations period for actions brought under § 502, 29 U.S.C. § 1132, so the Court borrows the most analogous statute of limitations from state law. *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 615 F.3d 808, 815 (7th Cir. 2010) (citing *Berger v. AXA Network LLC,* 459 F.3d 804, 808 (7th Cir.2006)). Normally, the most analogous Illinois

---

[2] The Court does not determine whether the notice received by the plaintiffs would have been sufficient under ERISA if the claims weren't barred.
[3] Although based upon the emails submitted to the Court, Weede may have had actual notice the Court finds no reason for further analysis because Weede had constructive notice.

statute of limitations is the ten-year limitations period for suits pertaining to written contracts. *Lumpkin,* 933 F.2d 449, 455 (7th Cir.1991)*; 735 ILCS 5/13-206. Phibro put forth, however, that New Jersey's six-year statute of limitations governs due to the choice of law provision in the Plan. Davis supports the use of the Illinois ten-year limitation. A choice of law provision does not apply to statutes of limitations unless the statute of limitation is specifically referenced by the provision. *See Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co.*, 2003 WL 1720023, 10 (N.D. Ill. 2003) (citing *Gluck v. Unisys Corp.,* 960 F.2d 1168, 1179 (3rd Cir.1992)). The Court may borrow limitations periods of a different state if it has a significant connection to the litigation. *Young*, 615 F.3d at 815-16. In determining that connection, the Court is to engage in a choice of law analysis. The Seventh Circuit has found the correct approach for determining which state's statute of limitation applies to be to "select a statute of limitations from the forum state's law unless another state has more significant contacts with the dispute." *Berger v. AXA Network LLC,* 459 F.3d 804, 813 (7th Cir. 2006). "This approach gives adequate, indeed great, weight to the concerns of predictability, certainty and ease of administration… and ensures some minimum congruence between the policy concerns underlying the federal cause of action and those underlying the state cause of action from which the limitations period is borrowed." *Id.*

The principal point of contention between the parties, however, is when the claim accrued. Although federal courts borrow state limitations periods for certain ERISA claims, the accrual of those claims is governed by federal common law. *Daill,* 100 F.3d at 65. The Seventh Circuit has held that a claim to recover benefits under § 502(a) accrues "upon a clear and unequivocal repudiation of rights under the pension plan which has been made known to the beneficiary." *Young*, 615 F.3d at 815; *Daill*, 100 F.3d at 66.

There are three potential dates of accrual, 1) when the plaintiffs received the notices and summary plan descriptions in May 1989 and September 1991, 2) when the plaintiffs received their final Accrued Benefit upon retirement (Davis on June 30, 2006 and Weede on April 8, 2009), or 3) when the administrative review was denied. *See Thompson v. Retirement Plan for Employees of S.C. Johnson & Son, Inc.*, 651 F.3d 600, 603 (7th Cir. 2011). The underlying philosophy of the "clear repudiation" standard is that of notice to the plaintiff. The Seventh Circuit has explicated this to mean a § 502(a) claim accrues "when the plaintiff knew or should know of conduct which interfered with the plaintiffs' ERISA rights." *Thompson*, 651 F.3d at 603 (citing *Young*, 615 F.3d at 816). The *Thompson* court held that summary plan descriptions and plan information do not always amount to a clear repudiation of rights sufficient to trigger the statute of limitations. *Id.* The court found the plan descriptions and notices were insufficient to convey the alleged defect and thus put the plaintiffs on notice because they were vague and left room for uncertainty especially because there was not much information about the right being infringed upon in general (interest on lump sum calculations with early retirement). *Id.* Although exhaustion of administrative remedies can be the point of accrual, it is not required as "that result would turn the administrative exhaustion requirement on its head, and that the "claim might never accrue and the statute of limitations would never expire ..." *Gelesky v. AK Steel Corp. Pensions Agreement Plan*, 2011 WL 5999035, 7 (S.D. Ohio, November 30, 2011) (relying upon *Redmon v. Sud–Chemie Inc. Retirement Plan for Union Employees,* 547 F.3d 531, 539-40 (6th Cir.2009)).

Likewise, the Seventh Circuit has held the receipt of a "lump sum payment" (or notice of that final payment upon retirement) can be insufficient to accrue a claim. In *Young*, the plaintiff argued the claim did not accrue until Verizon resolved her administrative appeal whereas

Verizon argued the claim accrued when the plaintiff received a lump sum payment several years earlier. *Young*, 615 F.3d at 815-16. The court held that the lump payment the plaintiff received was not sufficiently inconsistent with her expected benefit as to alert her to repudiation and the claim therefore accrued when Verizon repudiated her claim by denying her appeal. *Id.* at 816. The Court came to this conclusion because the lump sum paid was based upon a scrivener's error in the plan itself. In *Thompson*, however, the Seventh Circuit then held the payment of the lump sum was sufficient to trigger the statute of limitations because the plaintiffs "had received their account balance and nothing more" and therefore were on notice of their potential claim. *Thompson*, 651 F.3d at 606. The result of these three tests is necessarily a fact-based analysis of when the plaintiff knew or should have known of the potential claim. *See Thompson,* 651 F.3d at 603. It is an objective test in that it does not take into account when the plaintiff may actually have known but subjective in that it takes into account the facts of each circumstance as demonstrated by the discussion above.

B. Analysis

1) Choice of Law

The choice of law provision found in the Plan documents specifies New Jersey law as controlling. (Doc. 93-2). It does not, however, specifically reference the statute of limitation in the provision as required to be used by this Court. *See Central States*, 2003 WL 1720023, 10. The Court, therefore, continues on to the choice of analysis prescribed by the Seventh Circuit. The forum statute of limitations is Illinois and ten years. Phibro argues the Court should apply New Jersey's six year statute of limitations.

Phibro does not provide the Court with any reasoning apart from the choice of law provision as to why New Jersey would have more significant contacts with the dispute than

Illinois. Upon its own review, the Court has found the two plaintiffs reside in Illinois and were employed by the defendants in Illinois. Two of the corporate defendants are incorporated in Delaware and registered to do business in Illinois and in fact do business in Illinois. One corporate defendant is incorporated under the laws of New York and is both registered and doing business in Illinois. One individual defendant resides in New York and two in New Jersey. The Court sees no reason why New Jersey would have more of a significant contact to this litigation than Illinois. Both plaintiffs and the defendant corporations were all residing in and doing business in Illinois and the alleged violation of ERISA occurred in Illinois. As such, the Court adopts Illinois' ten year limitation period to the plaintiffs' remaining claim.

    2)   Tolling of the Statute

At the outset, the Court rejects Davis's argument the claim accrued after the administrative review was denied. The complaint in this case was filed on November 5, 2008 and the administrative review did not occur until September 18, 2009, after this Court sent the parties to exhaust remedies. Davis was obviously aware of his claim before the administrative review was denied as he had already filed suit. The Court finds the latest date of accrual to be the receipt of the Accrued Benefit when Davis and Weede retired. Based upon the facts of this case and the alleged expectations of Davis and Weede, it is impossible they would not have been aware of the alleged injury upon seeing a figure substantially (over $50,000) less than what was expected. The filing of this suit occurred well within the ten year statute of limitations period as it was filed November 5, 2008 and Davis retired on June 30, 2006. The more perplexing issue, however, is whether the claim accrued earlier based upon the summary plan descriptions and information given to the plaintiffs in 1989-1990.

The question is whether the "plaintiff knew or should know of conduct which interfered with the plaintiffs' ERISA rights" when they received the information in 1989-1990. *Thompson*, 651 F.3d at 603 (citing *Young*, 615 F.3d at 816). Other circuits have addressed this issue in reference to a claim arising from a "frozen" benefit plan. *See Pisciotta v. Teledyne Indus.*, 91 F.3d 1326 (9th Cir. 1996); *Union Pac. R.R. v. Beckham*, 138 F.3d 325 (8th Cir. 1998); *Hirt v. Equitable Ret. Plan for Employees*, 450 F. Supp. 2d 331 (S.D.N.Y. 2006), *aff'd*, 285 F. App'x. 802 (2d Cir. 2008). In *Pisciotta*, the Ninth Circuit held that the receipt of the summary plan descriptions explaining the "freeze" was sufficient to accrue the claim because the plaintiffs knew at that time their amounts were frozen and would not be increased. 91 F.3d at 1332. Similarly in *Union Pacific*, the plaintiffs all had made statements they were aware their previous service would not count as "service" under the new plan when they receive the publication from the company. 138 F.3d at 331.

In *Hirt*, the court held "Equitable's participants and beneficiaries knew, when they received the SPD of December 1992, that Equitable's cash balance plan would supplant its traditional final-average-salary benefits plan…" 450 F. Supp. 2d at 331-32. It held the accrual date to be the date the amendment became effective. *Id.* In *Thompson*, however, as previously discussed, the Seventh Circuit held receipt of information was not enough to accrue the information because the information was unclear and ambiguous. *Hirt* was further expounded upon by *Hakim* in the Northern District of Illinois. 656 F. Supp. 2d at 819-20. *Hakim* agreed with the accrual analysis in *Hirt* stating it "provides a sensible way to evaluate the repudiation issue." *Id. Hakim* interpreted *Hirt* as a two-part test, first requiring "terms be plainly and accurately stated" and next requiring the notice to clearly distinguish between pre and post plan amendment benefits. *Id.* at 820.

In the letter sent on May 30, 1989, Phibro sent notices to employees explaining that the company would now calculate the benefit based upon 1% of the average salary plus ½% of your average salary over your Average Social Security Taxable Wage Base. The notice went on to say, "[y]ou will, of course, receive credit for any benefit earned before July 1, 1989 under the previous formula." (Doc. 93-7). The company then sent "Highlights of the Revised Pension Plan" which although not dated, can be estimated to be prior to July 1, 1989 as the Highlights refer to the revised plan "which will be effective 7/1/89" and "your service includes all of your employment…after July 1, 1989." (Doc. 93-8, p. 2). The Court therefore concludes this notice was sent around the same time as the amendments were taking place. The Highlights state "[a]s of June 30, 1989, your accrued benefit will be calculated under the current Pension Plan formula. This benefit will be frozen and fully guaranteed." (Doc. 93-8, p. 2). It later states, "[a]ny benefits earned to date under the Plan will be 'frozen.' These benefits will not be reduced. You receive credit for these accrued benefits when you retire." (Doc. 93-8, p. 4).

The company later sent out a notice explaining the effect of the annuity purchased in 1991. It states "[w]ith respect to the annuity that will be purchased for participants of the plan, the amount payable will be the benefit you had accumulated under the plan as of August 31, 1991." (Doc. 93-11, p. 4). Both Davis and Weede then received annual statements with the amount owed them under the prior plan (the amount of the annuity) which never increased from statement to statement even though the total "Estimated Annual Plan Benefit at Normal Retirement" increased on each statement. (Doc. 93-14). The language of the Amendment also stated:

> Notwithstanding the foregoing, if a Participant's Normal Retirement Pension determined **as of June 30, 1989 based on Average Compensation determined as of June 30, 1989,** exceeds the amount determined in accordance with the first sentence of this Section 3.01(a), then the Participant's Normal Retirement Pension shall be his Normal

Retirement Pension determined as of June 30, 1990, based on Average Compensation determined as June 30, 1989.

(Doc. 137-11) (emphasis added).

The Court believes these notices satisfy the *Hirt/Hakim* criteria and were sufficient for Davis and Weede to discover their potential claim. The notices are both clear and accurate and distinguish between pre-amendment benefits and post-amendment benefits. *See Hakim,* 656 F. Supp. 2d at 819-20. The language of the Amendment was clear that the "Average Compensation" was to be "determined as of June 30, 1989." (Doc. 137-11). The Court also finds it persuasive that the amount of the annuity never went up on the statements even though the "Estimated Annual Plan Benefit at Normal Retirement" continued to rise on each statement. If Davis and Weede thought they were going to receive more money based upon the plan prior to changes, the lack of increase was reflected in the annual statement. Neither Davis nor Weede received less than what was on their annual statement. Davis and Weede thus had notice their Average Compensation for this period would not be re-calculated prior to retirement and could have discovered their potential claim. Weede also made statements in his deposition that he was aware the amount of the annuity was the accurate projection of what his pre-Amendment benefit would be. (Doc. 139-2, p. 23).

Due to the lack of dates on many of the notices circulated and in an abundance of caution, the Court finds the claim began to accrue on June 30, 1993, which is the date of the first Annual Benefit Statement provided to the Court (Doc. 93-14, p. 3) showing the purchased annuity, reflecting the benefit prior to the amendment, did not increase over time even though the Estimated Annual Plan Benefit did increase. At this point, having received all of the notices and letters, the plaintiffs either knew or could have known of their potential claim. Calculating the ten-year statute of limitations from June 30, 1993, the Court finds it expired on June 30, 2003.

As Davis did not file the present suit until November 5, 2008, the Court finds Count I is barred by the statute of limitations as to Davis and Weede.

V.    **Plaintiffs' Motion for Summary Judgment**

The only remaining claims in this matter were Count I for denial of benefits and Count III for improper notice. On Count I, the Court is finding judgment for the defendants based upon the tolling of the statute of limitations. On Count III, the Court is finding judgment in favor of the defendants because of the release signed by both plaintiffs. Consequently, the plaintiffs' motion for summary judgment (Doc. 136) is moot as there are no remaining claims.

VI.    **Motion to Certify the Class**

The plaintiff filed a motion for class certification in this case (Doc. 72) which the Court stayed (Doc. 152). The Court stayed the resolution of the motion for a number of reasons including the staleness of the briefing of the motion as a Second Amended Complaint with a new plaintiff had been filed, the doubling of the plaintiff class representative with the addition of Weede, the number of claims which had voluntarily been dismissed further rendering the prior pleadings stale, and the plaintiffs' likelihood of success on the merits. Having found judgment for the defendants on remaining Counts I and III, the Court now denies the Amended Motion to Certify Class (Doc. 72) and the Motion for a Hearing on Class Certification (Doc. 127) as moot.

VII.    **Conclusion**

The Court hereby **FINDS:**

**A.**  Plaintiff Weede's Motion to Strike (Doc. 147) is **DENIED**.

**B.**  the Defendants' Motion for Summary Judgment (Doc. 138) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, summary judgment on the counterclaim is

**DENIED** and the claim is **DISMISSED WITH PREJUDICE**.  Summary judgment based upon the release is **DENIED** as to Count I and **GRANTED in favor of** the Defendants as to Count III. Summary judgment on the basis of statute of limitations is **GRANTED** in favor of the defendants as to Count I.

C. the Plaintiffs' Motion for Summary Judgment (Doc. 136) is **DENIED AS MOOT.**

D. the Plaintiffs' Amended Motion to Certify the Class (Doc. 72) and Motion for Hearing on Class Certification (Doc. 127) are **DENIED AS MOOT.**

E. the Joint Motion for Telephone Conference (Doc. 144) is **DENIED AS MOOT.**

The Court further **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED:** January 13, 2012

s./ J. Phil Gilbert_____
**J. PHIL GILBERT**
**DISTRICT JUDGE**